**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| (1)  AMIR MIRESKANDARI | § | |
| | § | |
| VS. | § | **C.A. NO. 4:12-CV-02480** |
| | § | **JURY DEMANDED** |
| (1)   KEVAN CASEY, | § | |
| (2)    FAR EAST STRATEGIES, LLC, | § | |
| (3)    JINSUN, LLC, | § | |
| (4)    ACADIA HOLDING CORPORATION, | § | |
| (5)    JONATHAN CAMARILLO TRUST a/k/a | § | |
| CMK CHARITABLE REMAINDER | § | |
| UNITRUST, | § | |
| (6)   FREDERICK HUTTNER, | § | |
| (7)    HUTTNER 1999 PARTNERSHIP, LTD, | § | |
| (8)    MESIA HUTTNER HACHADORIAN | § | |
| (9)   JONATHAN FRIEDLANDER, | § | |
| (10)    EQUITY HIGHRISE, INC., | § | |
| (11) MARK TROTTER, | § | |
| (12) SCOTT GANN, | § | |
| (13)  LAZY BEAR, LLC, | § | |
| (14)  LEE BEAR, LLC, | § | |
| (15)   SUN BEAR, LLC, and | § | |
| (16)  OSO CAPITAL, LLC | § | |
| (17) LAWRENCE ISEN a/k/a ISEN FAMILY | § | |
| TRUST | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT, APPLICATION FOR TEMPORARY**
**RESTRAINING ORDER AND TEMPORARY INJUNCTION**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff, AMIR MIRESKANDARI ("Amir"), and complain of

Defendants, (1)  KEVAN CASEY ("Casey"), (2) FAR EAST STRATEGIES, LLC ("Far East"),

(3)  JINSUN, LLC ("Jinsun"), (4)  ACADIA LIFE INTERNATIONAL ("Acadia"), (5)

JONATHAN CAMARILLO TRUST a/k/a CMK CHARITABLE REMAINDER UNITRUST

("Camarillo Trust"), (6)  FREDERICK HUTTNER ("Huttner"), (7)  HUTTNER 1999

PARTNERSHIP, LTD ("Huttner Partnership"), (8)  MESIA HUTTNER HACHADORIAN

("Mesia"), (9) JONATHAN FRIEDLANDER ("Friedlander"), (10) EQUITY HIGHRISE, INC ("Equity Highrise")., (11) MARK TROTTER ("Trotter"), (12) SCOTT GANN ("Gann"), (13) LAZY BEAR, LLC ("Lazy Bear"), (14) LEE BEAR, LLC ("Lee Bear"), (15) SUN BEAR, LLC ("Sun Bear"), (16) OSO CAPITAL, LLC ("Oso"), and (17) LAWRENCE ISEN a/k/a ISEN FAMILY TRUST ("Isen"), and for cause would respectfully show the Court the following:

## I.

## PARTIES

1.      Plaintiff, Amir Mireskendari, is an individual residing in Harris County, Texas.

2.      Defendant, Kevan Casey, is an individual residing in Harris County, Texas and he may be served at the following address:

> Kevan Casey
> 3 W. Broad Oaks Drive
> Houston, Texas 77056

3.      Defendant, Far East Strategies, LLC, is a Nevada limited liability company, and may be served via service upon its registered agent:

> EASTBIZ.COM, INC., registered agent
> Far East Strategies, LLC
> 5348 Vegas Drive
> Las Vegas, Nevada 89108

Far East Strategies, LLC, is an entity controlled and managed by Kevan Casey, through his entity Silver Start Holdings Trust, of which Kevan Casey is the trustee.

4.      Defendant, Jinsun, LLC, is a foreign entity based in Wyoming who may be served at the following address:

> Wyoming Corporate Services, Inc., Registered Agent
> Jinsun, LLC
> 2710 Thomes Ave
> Cheyenne, WY 82001 USA

5.    Jinsun, LLC is an entity formed and controlled by Kevan Casey. Its purpose is to allow Kevan Casey to covertly pay for advertisements for stocks in which Kevan Casey and his co-conspirators are beneficial owners, in violation of federal securities laws. Defendant Casey has utilized Jinsun, LLC, to unlawfully promote numerous fraudulent stock scams including scams involving publicly traded, over the counter, bulletin board (OTC:BB) companies like China Global Media (CGLO) (exhibit 1), All Energy Corp (AFSE), China Electronic Holdings a/k/a CHE Delaware (CEHD) (exhibit 2), Weikang Bio-Technology Group Co, Inc. (WKBT) (exhibit 3), China Modern Agriculture Information (CMCI), Bering Exploration f/k/a Oncolin (BERX) (exhibit 4), and others.

6.    In many instances where Jinsun, LLC was used to promote a stock, it was done so while Kevan Casey, the owner of Jinsun, LLC, was either a direct beneficial owner of the stock in question or a beneficial owner through one of his numerous entities such as the Jonathan Camarillo Trust or  Silverstar Holdings Trust. Additionally, Mr. Casey funnels money through Jinsun, LLC to Next Media, LLC to pay for ads.  Next Media is a Mark Trotter controlled entity.

7.    Defendant, Acadia Holding Corporation, is a foreign company based in Delaware which may be served at the following address:

> The Corporation Trust Company, Registered Agent
> Acadia Holding Corporation
> Corporation Trust Center,  1209 Orange Street
> Wilmington, DE 1990

Acadia Holding Corporation is the US based holding corporation which owns Acadia Life International Limited, and Acadia Life Limited, which are Bermuda entities. All of the entities are a single business enterprise controlled by Kevan Casey or are alter egos of Kevan Casey.

8.      Defendant, Jonathan Camarillo Trust a/k/a CMK Charitable Remainder Unitrust, is a IRC 4947(a)(2) split interest remainder unitrust and it may be served via service upon its registered agent:

>       Jonathan Camarillo
>       5023 Polk Street,
>       Houston, Texas 77023

The trust is a purported split interest trust which is wholly owned and controlled by Kevan Casey. On information and belief, Casey uses this entity to disguise his status as an insider in his repeated stock fraud schemes, as well as to defraud the IRS and to launder illicit funds.  On information and belief, it is a sham and straw man trust involved in down-streaming, tax fraud, securities fraud, and money laundering.

9.      Defendant Frederick Huttner is an individual residing in Harris County, Texas and he may be served at the following address:

>       Frederick Huttner
>       675 Bering Drive, Suite 250A
>       Houston, Texas 77056

10.     Defendant Huttner 1999 Partnership, LTD is a Texas corporation which may be served at the following address:

>       Gary W. Miller, Registered Agent
>       Huttner 1999 Partnership, Ltd.
>       4265 San Felipe St., Suite 1200
>       Houston, TX 77027

11.     Defendant, Mesia Huttner Hachadorian, is an individual residing in Harris County, Texas and he may be served at the following address:

>       Mesia Huttner Hachadorian
>       1972 N. Calle Del Suerte
>       Tuscon, Arizona 85745

12.     Defendant, Mark Trotter, is and individual residing California who may be served at the following address:

> Mark Trotter
> 5420 La Jolla Blvd
> B-102
> San Diego, CA 92037

Mark Trotter was successfully sued by the Texas Attorney General for violating the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, and was fined $10,000,000.00, the single largest fine in Texas history to date for violating the spam email laws. Trotter and his other co-conspirators in the AG action created over 250 aliases and assumed names to run their enterprise related to unlawful spam email promotion of financial services. Additionally, the Securities Division of the Washington Department of Financial Institutions found that Trotter engaged in fraud, omissions, and violations of the Business Opportunity Fraud Act of the State of Washington in connection with YoNaturals, another entity formed and promoted by Trotter.  Mr. Trotter is *permanently enjoined* from using directly or indirectly aiding, facilitating, or conspiring with others to send any commercial email with false or misleading subject lines, false header information, false physical addresses of the sender, or false physical post address of the sender. He is also enjoined from sending any unlawful electronic communication across the internet. He is also enjoined from representing that a prior or pending business transaction exists where none has transpired.  (See Exhibit 5).

13.     Furthermore, on information and belief, marketing funds to the various pump & dump schemes were distributed through Jinsun, LLC, an entity owned and controlled by Kevan Casey.  Jinsun, LLC distributed funds to a company called Next Media, LLC, which then promoted various stocks including China Global Communications Stock, another potential stock

fraud scheme which most Defendants are involved in.  Next Media, LLC and Far East Strategies, owned by Silverstar Holdings Trust (a Kevan Casey controlled and/or owned entity), are incorporated in the same location and have the same registered agent.   (See Exhibit 6). Additionally, Next Media, LLC is managed by an individual named Jolly Backer. Mr. Backer, in addition to being the purported manager of Next Media, LLC, took over as CEO of a company known as Fresh Healthy Vending. Fresh Healthy Vending is the new name for YoNaturals, the company for which Mark Trotter was found to have violated Washington state law, and of which Mark Trotter is still the primary owner.  (Exhibit 7). Upon information and belief, Next Media, LLC, is owned and/or controlled by Mark Trotter.   However, Trotter is hiding his marketing efforts because (1) he is conspiring with Casey (2) because of the Fifth Circuit permanent injunction against him, and (3) because it is unlawful.

14.     Defendant, Jonathan Friedlander, is an individual residing in Las Vegas, Nevada, who may be served at the following address:

> Jonathan Friedlander, Registered Agent
> Equity Highrise, Inc.
> 5438 Vegas Drive, #761
> Las Vegas, NV 89108

15.     Defendant, Equity Highrise, Inc., is a foreign corporation based in Las Vegas, Nevada, which may be served at the following address:

> Jonathan Friedlander, President and Director
> Equity Highrise, Inc.
> 5438 Vegas Drive, #761
> Las Vegas, NV 89108
>
> Or
>
> Eastbiz COM, Inc., Registered Agent
> Equity Highrise, Inc.
> 5348 Vegas Drive

Las Vegas, Nevada 89108

16.     Defendant, Scott Gann, is an individual residing in Dallas, Texas and may be served at the following address:

> Scott Gann
> 5220 Spring Valley, Ste 195
> Dallas, TX 75254

Mr. Gann has been barred by the SEC from having any involving in the securities industry as a result of his prior fraudulent activity related to securities. In the opinion issued on January 13, 2010, in Scott B. Gann v. The Securities Exchange Commission, the Court found that Gann's **repeated securities fraud** and SEC 10(b) violations were done with a **high degree of scienter**, that Gann would likely repeat his fraudulent activity and upheld the **permanent injunction** barring Mr. Gann from associating with any broker, dealer, or investment adviser.  (See Exhibit 8).

17.     Defendant, Lazy Bear, LLC, is a foreign corporation wholly owned and controlled by Scott Gann for which Scott Gann is the registered agent, and it may be served via service on Mr. Gann at the following address:

> Scott Gann, Registered Agent
> Lazy Bear, LLC
> 5220 Spring Valley, Ste 195
> Dallas, TX 75254
>
> Or at
> Scott Gann, Registered Agent
> Lazy Bear, LLC
> 402 Appelrouth Lane
> Suite 1C
> Key West, FL 33040

18.     Defendant, Lee Bear, LLC, is a Texas entity which may be served via service upon its registered agent:

> David R Clouston, Registered Agent

Lee Bear, LLC
900 Jackson Street, Suite 440
Dallas, TX 75202

19.     Defendant, Sun Bear, LLC, is a Texas entity which may be served via service

upon its registered agent:

Scott Gann, Registered Agent
Sun Bear, LLC
5220 Spring Valley, Ste 195
Dallas, TX 75254

20.     Defendant, Oso Capital, LLC, is a Texas entity which may be served via service

upon its registered agent:

Scott Gann, Registered Agent
Oso Capital, LLC
5220 Spring Valley, Ste 195
Dallas, TX 75254

21.     Defendant, Lawrence Isen a/k/a Isen Family Trust, is an individual residing in

California who may be served at the following address:

Lawrence Isen
4653 Carmel Mtn. Suite 308-402
 San Diego, CA 92130

Or at

Larry Isen
10673 Hunters Glen
San Diego,  CA   92130

Lawrence "Larry" Isen is the owner of Market Byte, LLC, and acts under the name of Isen

Family Trust.  Isen and the Trust are alter egos.  He has prior judgments entered against him by

the SEC  for violations of multiple securities laws. (Exhibit 22).

## II.

## VENUE AND JURISDICTION

22.     Venue and jurisdiction are proper with this Court because the events giving rise to this lawsuit occurred in whole or in part in the Southern District of Texas and Plaintiff seeks damages within the jurisdictional limits of this Court. Furthermore, several of the Defendants reside in the Southern District of Texas.

## III.

## FACTUAL BACKGROUND

23.     This case stems from Defendants' organize, intentional, and unlawful conduct to highjack Luxeyard.com, a publicly traded entity (LUXR), at the expense of Plaintiff and Luxeyard's 7,000 shareholders.  Plaintiff recently discovered that before Luxeyard, Defendants have been involved in numerous unlawful "pump and dump" schemes in violations of numerous state laws, federal laws and SEC regulations.  These prior fraudulent schemes are believed to have included the stocks for Plasmatech (PMAH:OTC) (a/k/a Interactive Therapeutics a/k/a Zigen, Inc, a/k/a ZKevan, Inc, a/k/a Tabatha I),  Bering Exploration (BERX:OTC) (f/k/a Oncolin Therapeutics), All Energy Corporation (AFSE:OTC), Striker Oil (SOIS:OTC), Elinear, Inc. (ELU:OTC), China Armco Metals, Inc., (CNAM:OTC), Autobrag, Inc., Weikang Bio-Technology Group (WKBT:OTC), China Global Communications (CGLO:OTC), China Electronic Holdings (CEHD:OTC), and many others.  (Exhibit 9).

24.     In their unlawful "pump and dump" Luxeyard scheme, Defendants have profited approximately $30,000,000.00 within a 60 day window. (Exhibit10, Exhibit 11).  Defendants are continuing their unlawful conduct for the purpose of destroying the shareholder interest of Plaintiff and Luxeyard's 7,000 shareholders in an unlawful takeover attempt. (exhibit 10).

25.     "Pump and dump" is a form of stock fraud that involves artificially inflating the price of an owned stock through false and misleading positive statements, in order to sell the

cheaply purchased stock at a higher price. Once the operators of the scheme "dump" their overvalued shares, the price falls and investors lose their money.

26.     LY Retail was founded on or about April, 2011 by Plaintiff Amir Mireskandari. LY Retail was set up to operate a website called Luxeyard.com ("the Site"). The Site is a flash sales site, selling high end luxury items on the internet. There are other similar sites such as gilt.com, fab.com, zulily.com and ruelala.com. The sites are generally referred to as curated collection sites.

27.     LY Retail rapidly expanded its business and was attempting to raise capital. Plaintiff Amir, in his effort to raise capital, consulted with his longstanding personal financial advisor, Defendant Huttner. Defendant Huttner was a retained professional advisor to Plaintiff Amir since 2004.

28.     On or about August, 2011, Plaintiff Amir consulted with Defendant Huttner regarding the sought capital. Defendant Huttner arranged a meeting with Defendant Casey, a person introduced by Defendant Huttner as a professional investor.  Defendant Huttner failed to disclose to Plaintiff Amir that Defendants Huttner, Casey and "Casey's guys" were previously involved in unlawful "pump and dump" schemes that destroyed the target companies. Defendant Huttner further failed to inform Plaintiff Amir that many of "Casey's guys" were shady characters with a colorful list of law violations and various permanent SEC injunctions. Defendant Huttner, unbeknownst to Plaintiff, received $5,000,000.00 worth of stock from Casey and his co-conspirators to con Plaintiff into the transaction with Casey and the other Defendants. (Exhibit 11). **Huttner mislead Plaintiff in a direct violation of his fiduciary obligations to Plaintiff.**

29.     Following the Casey/Huttner meeting, LY Retail agreed that for $1,500,000.0, it would sell 50% of its assets to Defendant Far East Strategies, an entity owned and controlled by Kevan Casey through his entity Silverstar Holdings.

30.     The idea was to turn LY Retail and LuxeYard into a public entity, through a reverse merger, to raise capital, bring liquidity to the Company, and provide working capital. LY Retail had attracted an amazing management team, with a great business concept. The management team included experienced personnel with former clients such as Pottery Barn, Williams Sonoma, American Signature, West Elm, Target and Ikea.

31.     On or about August 28, 2011, Defendant Casey agreed to the following principle capitalization terms:

a.     The pre-money valuation of Luxeyard was $1,500,000.

b.     Casey and "his guys" will invest the following:
   (i)     $500,000 into Luxeyard directly
   (ii)    $1,000,000 for acquisition of a shell company ("Top Gear") and *market awareness program* ("Marketing").
c.     Post Casey's investment the book value of the company would be $3,000,000.00
d.     The Founders (Amir) would receive 20,000,000 shares
e.     Casey and his guys would receive 20,000,000 shares.

(exhibit 12)

32.     On or about September 1, 2011, Defendant Far East and LY Retail executed a Term Sheet ("Term Sheet") that outlined the principal terms of capitalizing Luxeyard. The Term Sheet provided the following:

**Issue Price -**              **$0.20 per share of common stock based upon 40,000,000 shares outstanding or 6.25% of the total shares of the company post reverse merger.**

**Lock-Up Agreement -**        **Officers and *insiders* agree to lock up their shares for 18 months after the closing date.**

| **Shell Equity -** | **Consummation of the reverse merger with a public shell. . . .   The shell will be provided by Far East Strategies, LLC** |

(Exhibit 13).

33.     Top Gear, Inc. ("Top Gear") was a Delaware *shell* corporation which had no revenues and limited operation.   Its shareholders were Israeli citizens.   Defendant Casey represented that he was personally paying to purchase the stock of Top Gear for $500,000.  The 1,600,000 shares of Top Gear, Inc., were to be transferred to Ly Retail as partial consideration for Casey's interest in Ly Retail. Unbeknownst to Plaintiff, on or about November 8, 2011, Defendant Casey arranged for the Top Gear stock to be transferred to "his guys."   Exhibit 14 Attached hereto identifies the selling Israeli shareholders and the Casey guys purchasers.

34.     Instead of paying Plaintiff Amir the cash portion of $500,000, Defendant Casey attempted to raise funds through a Series A private funding.  The people who Casey transferred the Top Gear stock were affiliates and underwriters of the Series A funding.  Instead of paying for the Top Gear shares, Casey got his co-conspirator investors from the Series A financing to provide the majority of the funding for the purchase of Top Gear shares. Defendant Casey did this to induce the Series A co-conspirators to buy the restricted Series A stock with the promise that he would provide them with allegedly unrestricted Top Gear stock. Defendant Casey did not pay the consideration for the Top Gear stock as he promised and represented but instead had his co-conspirators do it to allow them to cohesively obtain their claimed "unrestricted" shares of Top Gear.

35.     "Restricted stock" is stock that has not been registered with the SEC and is acquired from the issuing corporation or from a control person or affiliate.  "Control stock" is

stock that is owned by persons who control the business affairs of the issuing corporation, and can also include their close relatives, related trusts, estates, corporation and partnerships. Any person who owns more than 10% of the outstanding shares of the company is presumed to be a control person by the SEC. When individuals act together, for example, by collectively deciding the timing of sales and how much each will sell, these individuals must aggregate their sales. *Because Defendants were affiliates and/or control persons of Ly Retail, and the sellers of Top Gear stock were affiliates and/or control persons, all Top Gear stock that transferred was restricted regardless of the designation on the shares* (emphasis added). *Further, because Top Gear was a shell company, and Ly Retail was acquired by Top Gear through a reverse merger, the persons receiving Top Gear shares are "underwriters" pursuant to SEC Rule 145.*

36.     Additionally, Top Gear had a total amount of 7,000,000 restricted shares which were owned by two Israelis. As part of the selloff transaction, the two controlling Israelis spun off all of the operations and assets of Top Gear. They concurrently issued *1,600,000 new shares* of Top Gear to forty two (42) Israeli investors, then *retired* their 7,000,000 control restricted shares. This was done to obfuscate the fact that the 1,600,000 shares of Top Gear were *restricted stock* from control persons or affiliated persons of Top Gear.

37.     Casey's guys refers to the following persons, including their entities:

    (1)    KEVAN CASEY
        (a)  FAR EAST STRATEGIES, LLC,
        (b)  JINSUN, LLC,
        (c)  ACADIA HOLDING CORPORATION,
        (d)  JONATHAN CAMARILLO TRUST a/k/a CMK CHARITABLE REMAINDER  UNITRUST
    (2)    FREDERICK HUTTNER,
        (a)  HUTTNER 1999 PARTNERSHIP, LTD,
        (b)  MESIA HUTTNER HACHADORIAN (through Frederick Huttner)
    (3)    JONATHAN FRIEDLANDER,
        (a)  EQUITY HIGHRISE, INC.

      (4)      MARK TROTTER,
              (a) Next Media
      (5)      SCOTT GANN,
              (a)  LAZY BEAR, LLC,
              (b)  LEE BEAR, LLC, and
              (c)  SUN BEAR, LLC
              (d)  OSO CAPITAL, LLC
      (6)      LAWRENCE ISEN a/k/a ISEN FAMILY TRUST
      (7)      REMAINING SERIES A FUNDERS OTHER THAN PLAINTIFF

38.     Defendant Casey requested, per the Term Sheet, that Plaintiff Amir "lock up" and be restricted from selling the shares that he received for a period of 18 months. (Exhibit 13). Defendant Casey falsely represented that he and "his guys" would also lock up and be restricted from selling their shares for 18 months.

39.     On December 12, 2012, Gregg E. Jaclin, Casey's attorney, instructed the transfer agent of Top Gear as follows:

> Please issue the 1,340,000 shares of the Company's common stock to the individuals listed on Schedule B and deliver the share certificates via overnight mail to the addresses provided.  **Please hold the remainder of the shares for further instruction.**

(Exhibit 15).

40.     Defendant Casey kept 260,000 Top Gear Shares (1,600,000 - 1,340,000)  hidden without distribution to any shareholder.   Thereafter, Defendant Casey distributed the hidden shares to Defendant Jinsun and ultimately into a CEDE account. (Exhibit 16).

41.     Defendants divided the Top Gear shares as follows:

| | | % of issued | % of Float | % of Rest & Unrest |
|---|---|---|---|---|
| Acadia | 235,294 | 17.3% | 14.5% | 6.9% |
| Equity Highrise | 285,294 | 21.0% | 17.6% | 8.4% |
| Camarillo | 352,941 | 26.0% | 21.8% | 10.4% |
| Huttner | 242,647 | 17.8% | 15.0% | 7.1% |
| Jinsun & Other | 243,824+260,000(Jinsun) | 31.1% | 31.1% | 14.78% |
| | | | | |
| Total | 1,620,000 | | | |

42.      On November 30, 2011, the LUXR stock had a 1:17 forward split and changed its name from "Top Gear, Inc." to "LuxeYard, Inc." (Exhibit 10).

43.      LY Retail shareholders and Defendant Far East (Casey) were supposed to be each 50% shareholders of Top Gear with all the shares being restricted for 18 months.  However, through various "dummy companies" and other affiliates, Defendant Casey masked the capital structure of Top Gear with a series of "Casey's guys" shareholders. Additionally, the deal structured by Defendants was a completely different deal than agreed upon with Plaintiff.

44.      In violation of his agreement with Plaintiff Amir, Defendant Casey arranged for "unrestricted" stock (which was in fact restricted and should have borne a restricted legend to that affect) to be transferred to himself and "his guys." Defendants Casey and "his guys" were "affiliated" persons with "control."   Therefore, any stock obtained by Defendant Casey or "his guys" would be required to be **restricted**.  Holders of restricted stock of former "shell company," defined under Rule 144 of the Securities Act of 1933, as amended, as companies which have no or nominal operations or no or nominal assets (such as Top Gear prior to the transaction with LY Retail), are not able to sell their shares except pursuant to a registration statement, or pursuant to Rule 144, until the issuer ceases being a "shell company", the issuer files Form 10 type information with the SEC (i.e., information that would be required in a Form 10 Registration Statement), until at least **one (1) year has passed** after the Form 10 type information is filed (which was filed November 15, 2011), only assuming the issuer is current in its filings with the SEC, and pursuant to the Rule 144 "affiliate" sale rules, which allow the sale of only 1% of the issuers securities by any holders and related holders every three months, assuming that a legal opinion is obtained approving the sales, a Form 144 is filed with the SEC disclosing such sales

and the shares are sold in broker's transaction.  As less than a year had passed since the Form 10 information was filed with the SEC and the Defendant's failed to comply with the volume limitation, manner of sale and disclosure rules of Rule 144, the sales made by such Defendants were not in compliance with Rule 144 and were therefore illegal.

45.     Luxeyard went through several rounds of funding (Series A – D) to raise money from investors, friends & family, and Wallstreet as follows:

| Series | Amount Raised | Investors | Purchase Price | Warrants | Close Date |
|---|---|---|---|---|---|
| A | $  630,000 | Investors | $0.20 | $0.30 | 11/08/11 |
| B | $  400,000 | Investors | $0.30 | $0.60 | 11/08/11 |
| C | $3,000,000 | Friends & Family | $0.30 | | 04/24/12 |
| D | $  525,000 | Wallstreet | $0.50 | None | |

46.     On March 13, 2012 and March 14, 2012, there were 2 large block trades between Defendant Casey and one of "his guys" for approximately 1,394,000 shares ("Casey Media Trade") (Exhibit 10, 17).   The Casey Media Trade generated approximately $1,500,000 in proceeds for Casey.  On information and belief, these funds were used for the unlawful funding of Next Media, the entity who created and distributed mailers ("Mailers"), portraying Luxeyard as a great investment. (Exhibit 18).  Federal law prohibits the distribution of misleading Mailers by a control person. Defendants hid their payments to third party publishers by using corporate entities which Defendants controlled. The money for these advertisements came directly from Defendants, but those payments weren't disclosed in the advertisements themselves, in violation of Section 17(b) of the Securities Act of 1933.

47.     Unbeknownst to anyone other than Defendant Casey and "his guys," Casey and "his guys" spent approximately $4,500,000 to advertise LUXR using Next Media, LLC, and Jinsun, LLC to pay third party advertisers, which ultimately pushed the LUXR stock up higher than $2.00 per share. The $4,500,000 was spent on three separate high gloss mailers for which

the Defendants claim they paid approximately $1,500,000 each.   Between April 15, 2012 and May 20th,  2012, Casey and "his guys" sold more than 25,000,000 shares for their own benefit netting Casey and "his guys" approximately $30,000,000 in profits. (Exhibit 11)  Casey and "his guys" should not have been able to trade their shares as they were *restricted* shares under SEC rules and further restricted pursuant to Defendant Casey's promise to Plaintiff Amir.

48.     Between March 13, 2012 through July 9, 2012, almost 90,000,000 LUXR shares traded with a value of about $120,000,000. (Exhibit 17).   Defendant Casey and "his guys" "pumped" the LUXR stock through the Mailers and email spam.  When the LUXR stock reached their target point, Defendant Casey and "his guys" "dumped" the restricted stock and unlawfully gained $30,000,000 in profits at the expense of LUXR's 7,000 unsuspecting shareholder including Plaintiff Amir.

49.     Stockholders can place their shares with brokers. When placed with a broker, a shareholder may either have a Non Objection Broker Account (NOBO) or an Objecting Broker Account (OBO). The standard is to use a NOBO account, which shows the actual name of the shareholder.  OBO accounts are used when shareholders want to disguise their trading activity or to prevent others from seeing the true owner of the shares. Defendants used Objecting Broker Owner Accounts ("OBO Accounts") to disguise ownership of their stock. (Exhibit 16).  On April 5, 2011, **4,235,299** shares were deposited in LEK Securities account under an OBO Account. There was no trade in the stock at that point, so the shares transferred to the OBO Accounts were that of Defendants.  The stock balance in the OBO Accounts was sold as follows:

| Date | Balance | Sold Shares |
|------|---------|-------------|
| 04/05/2012 | 4,235,299 | ---------- |
| 04/19/2012 | 4,041,899 | 193,400 |
| 04/29/2012 | 3,882,600 | 159,299 |
| 05/05/2012 | 3,406,399 | 476,201 |

| | | |
|---|---|---|
| 06/29/2012 | 2,678,399 | 728,000 |
| 07/31/2012 | 730,199 | <u>1,948,200</u> |
| | | 3,505,100 |

Each of these transactions was in direct violation of SEC rules.

50.     Defendants sold approximately 3,200,000 shares in July in violation of SEC rules including Rule 144.   This heavy selling pressure on the LUXR stock caused the stock to plummet.   For further detail of the violating trades see Exhibit 19.

51.     On June 25, 2012, Plaintiff Amir confronted Defendants Casey and Huttner about turning Luxeyard into a "pump and dump" scheme.   Defendant Casey became aggressive and refused to respond to Amir's questions.   On June 25, 2012, LUXR stock was trading at approximately $0.62 per share.

52.     On June 26, 2012, the next day, Defendant Casey and "his guys" started ***massive dumping*** of LUXR stock, selling off approximately 3,800,000 shares. (Exhibit 17).   LUXR Stock immediately plummeted to $0.43 per share and continued a steady downward spiral to $0.12 per share on August 16, 2012.

53.     Shortly after June 26, 2012, Plaintiff Amir began to question Defendant Huttner, Casey and "his guys," about their intentions regarding Luxeyard stock and means by which they collectively operated. Plaintiff Amir voiced his concerns through Defendant Huttner, and accused their group of wrong doing.   From that point, all communication ceased.   All further messages were communicated through the CEO of the Luxeyard. Defendants then tendered several term sheets to the CEO of Luxeyard which all included death spiral financing to allow Defendants to seize control of the company. (Exhibit 20).

54.     Defendants Casey, Huttner, Gann, Friedlander, and others previously planned and executed a "Pump and Dump" scheme on other companies. Defendants have utilized Jinsun,

LLC and Next Media, LLC to unlawfully promote numerous fraudulent stock scams including scams involving publicly traded ,over the counter, bulletin board (OTC:BB) companies like China Global Media (CGLO), All Energy Corp (AFSE), China Electronic Holdings a/k/a CHE Delaware (CEHD), Weikang Bio-Technology Group Co, Inc. (WKBT), China Modern Agriculture Information (CMCI), Bering Exploration f/k/a Oncolin (BERX), and others. In nearly every instance where Jinsun,LLC or Next Media, LLC  was used to promote a stock, it was done so while Kevan Casey, Mark Trotter, and/or Scott Gann were either direct beneficial owners of the stock in question or beneficial owners through one of their numerous entities such as the Jonathan Camarillo Trust, Lee Bear, LLC, Lazy Bear, LLC, or  Silverstar Holdings Trust. (See Exhibit 7).

55.     LuxeYard is unable to raise any funds while Defendants are engaged in unlawful "dump" mode of their ***restricted*** shares.  Without capital injection, LuxeYard will run out of funds.  Defendants are attempting to "force" Plaintiff Amir and others to sell or pledge their LUXR shares for a small fraction of their value so that Defendants can take over control of LuxeYard and create another pump and dump condition.  Defendants further intend to dilute the shares of Plaintiff Amir and the shares of the other 7,000 LUXR shareholders.  Plaintiff Amir currently owns approximately 20,000,000 shares of LUXR stock.

56.     Defendants still own and control approximately 6,000,000 shares of LUXR stock ("Remaining Dump Stock") that they intend to "dump" into the market to ensure that LuxeYard's stock remains low. Defendants transferred all of their shares from NOBO accounts to OBO accounts within the last week. (Exhibit 21).

57.     Plaintiff Amir and LuxeYard's 7,000 stock holders will suffer irreparable harm if Defendants were to continue to "dump" the Remaining Dump Stock into the market. Plaintiff

Amir continues to fund the company out of his own pocket at a rate of approximately $500,000.00 per month.  Unless Defendants are restrained, Luxeyard will run out of operating capital and will not be able to raise any further capital.  This will force LuxeYard to cease its operations and terminate the employment of its 60 employees.

<div align="center">IV.</div>

<div align="center">**DEFENDANTS' STOCK IS RESTRICTED**</div>

**Defendants' Stock was Restricted from the Time They Acquired It as a Matter of Law.**

A.      **Top Gear Stock was Restricted**:

58.      Top Gear was a shell company and indicated it was a shell company by checking the box on its first 10-K filing, the 10-K filed for period ending December 31, 2010, filed May 2, 2011

> *"Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes þ No ¨"*

(Exhibit 23).

59.      Rule 144 states that shareholders of former shell companies cannot use the Rule until the issuer ***ceases being a shell company*** and **files Form 10** information with the SEC, and a period of **one year has passed** since Form 10 information was filed, during which time the issuer stays current in its filings with the SEC.  Rule 144 for former shell companies reads as follows in 144(i):

> **"*Unavailability to securities of issuers with no or nominal operations and no or nominal non-cash assets*.**
> *1. This section is not available for the resale of securities initially issued by an issuer defined below:*
> > *i. An issuer, other than a business combination related **shell company**, as defined in Rule 230.405, or an asset-backed issuer, as defined in Item 1101(b) of Regulation AB (Item 229.1101(b) of this chapter), that has:*
> > > *A. No or nominal operations; and*

       *B. Either:*
           *A. No or nominal assets;*
           *B. Assets consisting solely of cash and cash equivalents; or*
           *C. Assets consisting of any amount of cash and cash equivalents*
           *and nominal other assets; or*
      *ii. An issuer that has been at any time previously an issuer described in*
      *paragraph (i)(1)(i).*

      *2. Notwithstanding paragraph (i)(1), if the issuer of the securities previously had been an issuer described in paragraph (i)(1)(i) but has ceased to be an issuer described in paragraph (i)(1)(i); is subject to the reporting requirements of section 13 or 15(d) of the Exchange Act; has **filed all reports** and other materials required to be filed by section 13 or 15(d) of the Exchange Act, as applicable, **during the preceding 12 months** (or for such shorter period that the issuer was required to file such reports and materials), other than Form 8-K reports (Rule 249.308 of this chapter); **and has filed current "Form 10 information" with the Commission** reflecting its status as an entity that is **no longer an issuer** described in paragraph (i)(1)(i), then those securities may be sold subject to the requirements of this section after one year has elapsed from the date that the issuer filed "Form 10 information" with the Commission.*

    *60.*    Top Gear ceased being a shell company on November 8, 2011, pursuant to a series of transactions filing a Form 8-K on November 15, 2011, notwithstanding the fact that Top Gear received comments on such Form 8-K from the SEC and filed an Amended Form 8-K on December 12, 2011. (Exhibit 24). Therefore, the use of a Rule 144 resale exemption would NOT have been available to any holder of Top Gear stock until at the earliest, November 15, 2012, provided that its more than likely that sufficient Form 10 information was not filed until December 12, 2011, pushing the one year period of Rule 144(i) to December 12, 2012. This means that Defendants could NOT have made any sales using Rule 144 and any such sales were made illegally.

### B.    <u>Defendants Acted in Concert as a Control Group and Became Restricted Company Affiliates:</u>

    *61.*    Defendants have acted in concert in this case as they have in prior "pump and dump" activities. Defendants, acting in concert, controlled more than 10% of the company

stock's and are therefore presumed to be a control group / affiliates for purposes of Rule 144. Further, Defendants acted together by collectively deciding the timing of sales and how much each will sell, requiring their sales and ownership to be aggregated for Rule 144 purposes. Defendants are therefore a control group acting in concert for purposes of Rule 144. As such, they become affiliates of LUXR and Defendants' stock becomes **restricted** pursuant to Rule 144, which requires that all securities held by affiliates of an issuer are automatically considered restricted securities whether or not they bear a restrictive legend. As described in A above, affiliates and control persons of Top Gear were not eligible to rely on Rule 144 for their sales, and as such, the sales by Defendants were illegal. Defendants have acted together in a similar manner with respect to the stock in Bering Exploration, All Energy, Plasmatech, Striker Oil, Autobrag, and many others stocks.

C.     **Insider Trading (Conduct of Defendants):**

62.     Insider trading occurs when someone makes an investment decision based on information that is not available to the general public. In some cases, the information allows them to profit, in others, avoid a loss.

63.     Section 16 of the Exchange Act, with respect to any company whose securities are registered on a national securities exchange, imposes certain obligations and restrictions on the company's officers directors, and "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security)." **15 U.S.C. § 78p(a)(1).** Directors, officers, and beneficial owners are those presumed to have access to inside information.

64.     Congress enacted § 16(b) of the Act, which provides, in pertinent part, as follows:

(b) <u>Profits from purchase and sale of security within six months</u>. For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) . . . within any period of less than six months, . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security . . . purchased or of not repurchasing the security . . . sold for a period exceeding six months. . . . This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security . . . .

15 U.S.C. § 78p(b).

65.     Profits resulting from purchase-and-sale, or sale-and-repurchase, transactions within a period of less than six months are commonly known as "short-swing" transactions. ***SEC Rule 16a-1(a)(3), 17 C.F.R. § 240.16a-1(a)(3)***. As indicated by the "irrespective of any intention" clause in § 16(b), that section is a strict-liability provision; it "requires the inside, short-swing trader to ***disgorge*** all profits realized on all 'purchases' and 'sales' within the six-month period, without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information.  The Exchange Act also recognizes that the abuses it targets may be accomplished by persons acting not individually but in combination with others. ***15 U.S.C. § 78m(d)(3).***  SEC Rule 16a-1(a)(1) provides that, "[s]olely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities," the term "beneficial owner" means, "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder." ***17 C.F.R. § 240.16a-1(a)(1.***  Section 13(d) of the Act provides that when two or more persons act as a partnership, limited partnership, ***syndicate***, or other ***group*** for the purpose of acquiring, holding, or disposing

of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection. *15 U.S.C. § 78m(d)(3)* (emphases added).

66.     SEC Rule 13d-5(b)(1) provides that when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by *any* such persons. *17 C.F.R. § 240.13d-5(b)(1).* Accordingly, under § 13(d)(3), if two or more entities agree to act together for any of the listed purposes, a "group" is "thereby" formed.  Thus, the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective.

67.     Although a common purpose to acquire control of the issuing company would be an indicium of collective action within the meaning of § 13(d), it is not an essential. The agreement required by § 13(d)(3) need not be an agreement to gain corporate control or to influence corporate affairs. . . . The plain language of § 13(d)(3) demands only an agreement "for the purpose of acquiring, holding, or disposing of securities. Further, evidence that group members "might not always make identical investment decisions" does "not preclude existence of an agreement."  Importantly, the actors need not have combined for all of the purposes listed in § 13(d)(3) or Rule 13d-5(b)(1).  Acquiring, holding, and disposing of are listed in the disjunctive.  Hence, all that is required is that the members of the group have combined to further a common objective with regard to one of those activities.

68.     If the persons agreed to act together for the purpose of purchasing an issuer's shares, a "group" was "thereby" formed.  *17 C.F.R. § 240.13d-5(b)(1)*;  if they acted as a "group," they must be treated as a single person, *15 U.S.C. § 78m(d)(3),* and each person in the

group "shall be deemed" to be the beneficial owner "of all equity securities of that issuer beneficially owned by any" member of the group. *17 C.F.R. § 240.13d-5(b)(1).*

69. Defendants were investors in the Series A through D rounds and were active participants in negotiations, and acted as a group. During the entire time that money was being raised, Defendants sold more than $15,000,000 in restricted LUXR stock. Defendants had actual knowledge that LUXR stock would drop because the terms of the financing in the Series were 80% below the market pricing. Insider trading can be a criminal matter. Further, each of the defendants signed a subscription agreement acknowledging that they were aware of sensitive insider information.

**D.    Rule 506 Violations (Conduct of Defendants).**

70. Defendants attempted to register the company as a Rule 506 Regulation D and Section 4(2) of the Securities Act of 1933. However, in order to qualify for that registration type, which might make some of the shares exempt from SEC Rule 16, all of the shares of the company would have had to be *restricted*. Additionally, Defendants could not use general solicitation or advertising to market the securities if they wanted to stay within the Regulation D Rule 506 safe harbor. Therefore, Defendants shares were restricted and in violation of SEC Rule 16.

<div align="center">

**VI.**

**CAUSES OF ACTION**

</div>

<u>**Count 1:   Texas Securities Act Violations:**</u>

71. Plaintiff incorporate by reference the factual allegations contained above. Defendants offered or sold securities to Plaintiff by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of

the circumstances under which they are made, not misleading.  **Tex. Vernon's Ann. Civ. St.**
**Arts. 581-1 et seq.**  Defendants violated the  penal and civil provisions of the Texas Securities
Act by misrepresenting and/or omitting the disclosure of material facts.  The penal provisions of
the Act state:

> Any person who shall:
>
> A. Sell, offer for sale or delivery, solicit subscriptions or orders for, dispose of,
> invite offers for, or who shall deal in any other manner in any security or
> securities without being a registered dealer or agent as in this Act provided shall
> be deemed guilty of a felony, and upon conviction thereof shall be sentenced to
> pay a fine of not more than $5,000 or imprisonment in the penitentiary for not less
> than 2 or more than 10 years, or by both such fine and imprisonment.
>
> …….
>
> C. In connection with the sale, offering for sale or delivery of, the purchase, offer
> to purchase, invitation of offers to purchase, invitations of offers to sell, or dealing
> in any other manner in any security or securities, whether or not the transaction or
> security is exempt under Section 5 or 6 of this Act, directly or indirectly:
>
> (1) engage in any fraud or fraudulent practice;
>
> (2) employ any device, scheme, or artifice to defraud;
>
> (3) knowingly make any untrue statement of a material fact or omit to state a
> material fact necessary in order to make the statements made, in the light of the
> circumstances under which they are made, not misleading; or
>
> (4) engage in any act, practice or course of business which operates or will
> operate as a fraud or deceit upon any person, is guilty of a felony and upon
> conviction shall be:
>
> (a) imprisoned for not less than 2 or more than 10 years and fined not more than
> $10,000, if the amount involved in the offense is less than $10,000;
>
> (b) imprisoned for not less than 2 or more than 20 years and fined not more than
> $10,000, if the amount involved in the offense is $10,000 or more but less than
> $100,000; or

(c) imprisoned for life or for not less than 5 or more than 99 years and fined not more than $10,000, if the amount involved is $100,000 or more.

I. Render services as an investment adviser or an investment adviser representative without being registered as required by this Act shall be deemed guilty of a felony and on conviction of the felony shall be sentenced to pay a fine of not more than $5,000 or imprisonment in the penitentiary for not less than two or more than 10 years, or by both the fine and imprisonment.

***Tex. Rev. Civ. Stat. Ann. art. 581-29(B)***. Defendants violated sections A&I by not being registered agents, dealers, and/or investment advisors. Defendants violated The Texas Securities Act as outlined above.

72.     Defendants are further liable under the civil penalty provisions of the Texas Securities Act. Specifically, the act states:

A. Liability of Sellers. (1) Registration and Related Violations. A person who offers or sells a security in violation of Section 7, 9 (or a requirement of the Commissioner thereunder), 12, 23C, or an order under 23A or 23-2 of this Act is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security.

(2) Untruth or Omission. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission. The issuer of the security (other than a government issuer identified in Section 5M) is not entitled to the defense in clause (b) with respect to an untruth or omission (i) in a prospectus required in connection with a registration statement under Section 7A, 7B, or 7C, or (ii) in a writing prepared and delivered by the issuer in the sale of a security.

B. Liability of Buyers. A person who offers to buy or buys a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material

> fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person selling the security to him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the seller knew of the untruth or omission, or (b) he (the offeror or buyer) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.
>
> C. Liability of Nonselling Issuers Which Register.
>
> (1) This Section 33C applies only to an issuer which registers under Section 7A, 7B, or 7C of this Act, or under Section 6 of the U.S. Securities Act of 1933, its outstanding securities for offer and sale by or for the owner of the securities.
>
> (2) If the prospectus required in connection with the registration contains, as of its effective date, an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the issuer is liable to a person buying the registered security, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the securities. However, an issuer is not liable if it sustains the burden of proof that the buyer knew of the untruth or omission.
>
> F. Liability of Control Persons and Aiders.
>
> (1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.
>
> (2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

***TEX. REV. CIV. STAT. ANN. art. 581-33.*** Defendants bought, sold, and issued securities using fraudulent means and communications in direct violation of the civil penalty provisions of the act, and these actions damaged Plaintiff by devaluing Plaintiff' company and shares.

**Count 2 - Fraud (Omission and Commission)**

73.     Defendants committed fraud in connection with the purchase and sale of securities.  There were several purchases and sales of securities, including purchase of control of the shell.  In connection with the purchase of control of the shell company, the Defendants bought up the registered stock of the shell from the minority shareholders, setting the stage for their market manipulation.  The Defendants had the shell company issue stock to the equity holders of Plaintiff's company, including Plaintiff Amir, another sale of securities.

74.     As part of their scheme, the Defendants (1) had the Plaintiff unknowingly buy stock in the private placement instead of a reverse merger as represented, (2) had the Plaintiff agree to "lock up" the securities he bought for a full 18 months, (3) bought stock in the company in the private placement and arranged for others to do so as incentive to obtain free trading stock in violation of securities law, (4) arranged for the private placement securities to be issued and sold with "full ratchet" provisions, setting up their later attempt to grab control of the company, (5) arranged for a massive publicity campaign through entities controlled by Defendants, that included a fraudulent disclaimer and grossly exaggerated projections for the stock price that they knew would not be met because the Defendants were dumping their stock and intended to drive the stock down so they could take over the company (this induced massive buying of the stock by the public while the Defendants sold), and (6)  deliberately crashed the price of the stock by selling large amounts of stock at bargain prices. While doing so, Defendants Gann and Trotter were believed to be acting in direct violations of the permanent injunctions issued against them by the federal courts.   Other misrepresentations between the deal done by Defendants and the deal that was represented to Plaintiff have been outlined above.

75.     Defendants' fraudulent scheme was in connection with a series of purchases and sales of securities and was an integrated plan. These transactions involved fraud, fraudulent

nondisclosure, and/or violations of the securities laws and regulations, as well as the use of both the post service and interstate wire communications.

76.     The frauds or commission and non-disclosures in this case indicate the vicious nature of the Defendants entire scheme.  Defendants did not reveal to the Plaintiff (1) that they were getting control of the float, (2) that they were gaining control of the float to manipulate the stock, (3) their scheme to use the 18 month lock up as part of their scheme to manipulate the stock by keeping other stock off the market (lock ups are done to allow investment bankers to place securities with buyers without having the interference of insider selling; 18 months is an exceptionally long period utilized by Defendants to further defendants' pump and dump), (4) their intent to manipulate the stock. Defendants further failed to disclose their prior histories of legal issues involving moral turpitude. Defendants further failed to disclose their relationships with other. Defendants further failed to disclose that they would be trading restricted stock as unrestricted stock.

77.     Defendants issued restricted stock to themselves and their affiliates while representing to each other and their affiliates that by purchasing restricted stock, the purchasers would then be able to covertly purchase unrestricted stock at a severe market discount. This transaction was unknown to Plaintiff.  Defendants had the Plaintiff buy restricted stock without knowing that other investors were getting additional unrestricted stock at a steep discount as an incentive, an unlawful side deal. Defendants arranged for the private placement securities to be issued and sold with "full ratchet" provisions, setting up their later attempt to grab control of LuxeYard.  Defendants arranged for a massive publicity campaign, that included a fraudulent disclaimer and grossly exaggerated projections for the LUXR stock price that they knew would not be met because the Defendants were dumping their stock and intended to drive the stock

down so they could take over LuxeYard. Upon information and belief, this campaign was orchestrated by Casey, Mark Trotter, and the other defendants. Mr. Trotter has a long notorious history of engaging in misrepresentation of business opportunities and using spam email to promote various fraudulent schemes. At all pertinent times he has been under an injunction barring him from utilizing computers to promote fraudulent business opportunities. Defendants' marketing blitz induced massive buying of the stock by the public while Defendants sold. Defendants later deliberately crashed the price of the LUXR stock by selling large amounts of stock at bargain prices, making more sales of securities. The use of selling to manipulate the price of a stock that has convertible securities owned by the manipulators is a fraudulent device according to the SEC. Defendant Gann has previously been found to have utilized market timed transactions to manipulate stock prices and has been permanently enjoined from doing so.

78.     Furthermore, Defendants Casey and Huttner made material misrepresentations that Plaintiff relied upon to their detriment.  Defendants Casey and Huttner stated that Casey would (1) provide $500,000 in working capital to LY Retail, (2) provide $1,000,000 in Shell and legal market awareness, (3) become 50/50 shareholder of LY Retail, which would then reverse merge into a shell publicly held company, (4) be restricted on the transfer of their shares in LY Retail or in the shell company as "insiders" of the company.  Upon further information and belief Defendants engaged in unlawful marketing, while failing to disclose this activity to Plaintiff. Upon further information and belief, Defendants did not do a reverse merger as represented, but instead did a private placement deal wherein Casey and his affiliates obtained 100% of Top Gear from its shareholders, allowed the senior Shareholders of Top Gear to transfer out their assets, and then concealed the fact that it was Casey and the co-conspirators controlling all of the newly acquire Top Gear shares. Instead of giving Top Gear shares to LY Retail as represented,

Defendants kept them for themselves. Instead of making Top Gear buy 100% of the reverse merged LY Retail, Defendants conspired to do a private placement of LY Retail into Top Gear. Eventually, the differences in the deals are: (1) Plaintiff' new shares were restricted while Casey and "his guys" were claiming that their shares are not restricted. The deal Defendants executed made it look like LY Retail is owned by Amir Miresekandari 100% because Amir is the only one that has new shares from Top Gear. The deal which Defendants executed was completely different than the deal that was represented and agreed to by Plaintiff. The above statements were false.  Plaintiff relied on said statements and suffered damages.

79.     Additionally, Defendants Casey and Huttner failed to disclose material facts in order to induce Plaintiff into the transaction with Defendants.  Defendants Casey and Huttner failed to disclose that (1) they were previously involved in "pump and dump" schemes that destroyed the target companies, (2) that their true intention was to pump the price of LUXR stock up so that they could then dump it and made substantial amounts of money, and (3) that their co-conspirators Mark Trotter and Scott Gann had previous legal issues involving moral turpitude.  Defendants further failed to disclose the true nature of the Top Gear deal, failed to disclose the true ownership of the Top Gear Shares, failed to disclose their insider trading, failed to disclose their unlawful market manipulation, failed to disclose their trading of restricted shares, and failed to disclose their intent to take over the company after devaluing the company through these actions. Plaintiff relied on Defendants acts of commission and omission and suffered damages.

## Count 3 - Breach of Contract:

80.     Plaintiff and Defendants Casey and Far East entered into an Agreement by which Defendants Casey and Far East agreed to (1) provide $500,000 in investment to LY Retail, (2)

provide $1,000,000 in shell and market awareness, (3) become 50/50 shareholder of LY retail, that will undertake a reverse merger into a shell publicly held company, and (4) be restricted on the transfer of their shares in LY retail or in the shell company as "insiders" of the company. Defendants Casey and Far East breached their agreement by (1) not providing the $500,000 in investment to LY Retail, providing unlawful marketing material in violation of Federal law, (3) trading their restricted shares through "Casey's guys" which caused the value of LUXR to plummet, and (4) orchestrating the transaction with Top Gear in a manner different than what Plaintiff and Defendants Casey and Far East agreed to .  As a result of their breach, Plaintiff suffered damages.  Further, Defendants failed to execute the reverse merger as agreed and instead executed a completely different transaction as outlined above.

## Count 4 – Breach of Fiduciary Duty:

81.  LY Retail, for purposes of expanding its business, was trying to raise capital.  In their efforts to raise capital, Plaintiff consulted with Amir's longstanding personal financial advisor, Fredrick Huttner.  Huttner has been a retained professional advisor of Amir since 2002.

82.   Huttner arranged a meeting between himself, Kevan Casey any Mr. Mireskandari. Kevan Casey was introduced to Mr. Mireskandari as a potential professional investor by Huttner; they had been doing a lot of transactions together in recent years.

83.   Amir had financed the early and developmental growth of Luxeyard.com. The site was set up, merchandise was being obtained, and an infrastructure was being built. To build LY Retail, owner of the Luxeyard.com website, capital was needed. Amir learned from Huttner and Casey that they could help raise the necessary capital for LY Retail.

84.   Huttner and Casey convinced Amir that a public structure would be a very good vehicle to raise capital and build long term liquidity and access to capital for Company. They

offered to partner with LY Retail to reverse merge the Company into a public shell and help raise further capital.

85.     Defendant Casey arranged to finalize the transaction, which they ultimately changed unbeknownst to Plaintiff. Plaintiff Amir was depending on his financial advisor, Huttner, to ensure the fairness of the transaction.

86. Instead of the capital structure sold to Plaintiff by Huttner and Casey, a very complicated web of transactions and companies emerged whose agenda was to defraud other existing shareholders, to leave Amir as the fall guy, and create a market to attract thousands of other shareholders to defraud. Plaintiff would not have entered into any transaction with Defendants if they had known of the previous regulatory and legal issues of the people who would ultimately become involved. Plaintiff would also not have entered into any transactions with Defendants if Huttner had not represented to Plaintiff that he would obtain legitimate, legal financing, that would benefit the shareholders of Ly Retail as well as Plaintiff.

87.     Defendants Casey and Huttner, acting in conspiracy, sought to provide financial advice, guidance, and planning to Plaintiff. Securities brokers and agents, as well as attorneys, accountants, and financial advisors owe fiduciary obligations to their clients. By providing fraudulent financial advice and guidance, and by employing attorneys and accountants to defraud Plaintiff for their own benefits, Defendants acted in conspiracy to breach their fiduciary obligations to Plaintiff, and Plaintiff suffered damages as a result thereof.

## Count 5 – Conspiracy:

88.     Defendants acted in a concerted and coordinate manner to defraud Plaintiff, violate state and federal law, to defraud  individual investors, and to steal control of the company

from Plaintiff. Upon information and belief, Defendants have conspired to and have performed similar pump and dump stock fraud schemes in the past and continue to do so.

89.     Furthermore, on information and belief, marketing funds to the various pump & dump schemes were distributed through Jinsun, LLC, an entity owned and controlled by Kevan Casey.  Jinsun, LLC distributed funds to a company called Next Media, LLC, which then promoted various stocks including China Global Communications Stock, another potential stock fraud scheme which Defendants are involved in.   Next Media, LLC and Far East Strategies, owned by Silverstar Holdings Trust (a Kevan Casey controlled and/or owned entity), are incorporated in the same location and have the same registered agent.   (See Exhibit 6). Additionally, Next Media, LLC is managed by an individual named Jolly Backer. Mr. Backer, in addition to being the purported manager of Next Media, LLC, took over as CEO of a company known as Fresh Healthy Vending. Fresh Healthy Vending is the new name for YoNaturals, the company for which Mark Trotter was found to have violated Washington state law, and of which Mark Trotter is still the primary owner.  (Exhibit 7). Upon information and belief, Next Media, LLC, is owned and/or controlled by Mark Trotter.  However, Trotter is hiding his marketing efforts because he is conspiring with Casey and because of the Fifth Circuit permanent injunction against him. Other prior fraudulent transactions involving Gann, Casey, Huttner, Friedlander, Trotter, and other defendants are believed to include the stocks for Plasmatech (PMAH:OTC) (a/k/a Interactive Therapeutics a/k/a Zigen, Inc, a/k/a ZKevan, Inc, a/k/a Tabatha I) (involving Gann), Bering Exploration (BERX:OTC) (f/k/a Oncolin Therapeutics) (involving, Casey, Huttner, Gann) , All Energy Corporation (AFSE:OTC) (involving Gann, Casey, Friedlander), Striker Oil (SOIS:OTC), Elinear, Inc. (ELU:OTC), China Armco Metals, Inc., (CNAM:OTC),

Autobrag, Inc., Weikang Bio-Technology Group, China Global Communications, China Electronic Holdings, and many others

90.     In nearly every instance where Jinsun,LLC or Next Media was used to promote a stock, it was done so while one or more defendants were beneficial owners or insiders of the stock. The Defendants' concerted actions caused Plaintiff damages.

**Count 6 – SEC 10b-5 Violations:**

91.     SEC Rule 10b-5 prohibits fraudulent activity in connection with securities. Specifically, the rule states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5. Plaintiff incorporate by reference the factual allegations contained above.

92.     The Defendants made a material misrepresentation or omission. Defendants acted with "scienter", or a "wrongful state of mind".  The material misrepresentation or omission was made "in connection with the purchase or sale of a security".  Plaintiff was victimized by the fraud and relied upon the material misrepresentation or omission.  Plaintiff suffered an economic loss as a result of the alleged fraud.

93.     Defendants used instrumentalities of interstate commerce, the stock exchange and the US Postal service, to artificially inflate the share price of LUXR, to dilute Plaintiff's shares,

to unlawfully sell restricted shares, to issue false press releases for which Defendants paid money in violation of other SEC regulations, and intentionally failed to make the proper disclosures related to insider trading, the control of the trading accounts used, and engaged in an ongoing patter of fraudulently activity with respect to Plaintiff.  Said actions are direct violations of SEC rule 10b-5.  *17 C.F.R. §240.10b-5.*   As a result of Defendants' wrongful conduct, Plaintiff suffered damages.

## Count 7 – Violation of 15 U.S.C. §78j(b)

94.     Defendants, directly or indirectly, by the use of means and/or instrumentalities of interstate commerce, the mails, and the stock exchange engaged in unlawful short-selling, and manipulative and deceptive securities-based swap agreements.  The law states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange:
>
> (a)
> (1) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
> (2) Paragraph (1) of this subsection shall not apply to security futures products.
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
>
> (c)
> (1) To effect, accept, or facilitate a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
> ….
> Rules promulgated under subsection (b) of this section that prohibit fraud,

manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) of this section and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities. Judicial precedents decided under section 77q (a) of this title and sections 78i, 78o, 78p, 78t, and 78u–1 of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

15 U.S.C. § 78j(b).

95.    Defendants made a material misrepresentation or omission, acted with scienter, there was a connection between the misrepresentation or omission and the purchase or sale of a security, Plaintiff relied upon the misrepresentation or omission, and Plaintiff suffered economic loss.  Defendants violated the statute by unlawfully shorting LUXR stock, by conducting securities transactions in violation of Rule 144, by engaging in fraudulent behavior with respect to securities and securities based swap agreements, and by engaging in wrongful conduct described above.

## Count 8 - Violation of the Racketeer Influenced Corrupt Organizations Act:

96.    The Racketeer Influenced Corrupt Organizations Act ("RICO") provides that certain activities are racketeering and that a pattern of these activities is actionable both civilly and criminally. Specifically the act defines racketeering as follows:

(1) "racketeering activity" means
        …
    (B) any act which is indictable under any of the following provisions of Title 18, United States Code:
            section  1341 (relating to mail fraud),
            section  1343 (relating to wire fraud),
            section  1344 (relating to financial institution fraud),
            section  1952 (relating to racketeering),
            section  1956 (relating to the laundering of monetary instruments),

> section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful monetary activity)

> (D) fraud in the sale of securities

18 U.S.C. §1961(1). The pattern of racketeering activity is defined as:

> (5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

18 U.S.C. §1961(5).

97.     Upon information and belief, Defendants have on at least one other occasion during the last ten years used the US Postal Service, the internet, and the stock markets to engage in fraudulent activity. Further, upon information and belief, Defendants used funds unlawfully obtained through their prior unlawful activity to further engage in securities fraud and the laundering of monetary instruments. Defendants further used their prior gained unlawful proceeds to fund their current criminal transactions. Defendants additionally engaged in interstate and foreign travel for the purposes of furthering their racketeering activities. The racketeering acts of Defendants had the same or similar purposes, results, participants, victims, and methods of commission, and were otherwise interrelated by distinguishing characteristics and are not isolated events.  Plaintiff therefore assert a civil RICO claim against Defendants and seek treble damages as allowed by the statute in addition to any other damages for which Plaintiff have plead or to which they are entitled. Defendants have conspired to manipulate stock prices and engage in fraudulent insider trading, SEC prohibited activities, and mail fraud with respect to Striker Oil, Bering Exploration, Plasmatech, Interactive Therapeutics, All Energy Corp, Silverhorn Mining, and Elinear.

**Count 9 -  Violation of Section 17 of the Securities Act of 1933, 15 U.S.C §77q:**

98. Defendants conspired and worked to **employ** a scheme to defraud Plaintiff and other shareholders, to obtain money or and shares by using material misstatements or omissions, and engaged in transactions, practices, and courses of business which operated as fraud and deceit upon Plaintiff. The pertinent statute states:

> (a) **Use of interstate commerce for purpose of fraud or deceit**
> It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
>
> (b) **Use of interstate commerce for purpose of offering for sale**
> It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

15 U.S.C. §77q. Defendants use the instrumentalities of interstate commerce, including the postal service, internet, and phones to engage in fraudulent activity related to unlawfully sell LUXR shares.

## Count 10 – Violation of Section 16(b) of the Securities and Exchange Act of 1934 (Defendant Conduct):

99. Generally, Section 16 imposes reporting obligations on "insiders" and permits the

Plaintiff to recover profits made by its "insiders" on certain purchase and sale transactions occurring during any period of less than six months. In addition, insiders are prohibited from selling any of the issuer's equity securities "short" or entering a transaction which is deemed to be the equivalent of a short sale.  In the absence of other transactions affected by an insider that may be subject to Section 16(b) "short swing profit" liability, an insider who has held an employee stock option for at least six months will be able to exercise the option and immediately sell the underlying security without short swing profit liability.

100.    Defendants, acting in concert as holders of more than 10% of the outstanding stock of the company, made profits by trading securities held less than 6 months. As holders of more than 10% of the outstanding shares, and acting in conspiracy, Defendants are strictly liable to the company for all profits made on these trades. Defendants further failed to file disclosures as required by Section 16.   Disgorgement of profits is an adequate remedy for Rule 16b violations.

101.    Furthermore, the objective standard of 16(b) imposes *strict liability* upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation.  This approach maximizes the ability of the rule to eradicate speculative abuses by reducing difficulty in proof.

**Count 11 – Violations of SEC Rule 144 and Section 5 of the Securities Act of 1933:**

102.    When a person or entity acquires restricted securities or hold control securities, they must find an exemption from the SEC's registration requirements in order to sell them. Rule 144 allows public resale of restricted and control securities if a number of conditions are met.

103.     Restricted securities are securities acquired in unregistered, private sales from the issuer or from an affiliate of the issuer.  Investors typically receive restricted securities through private placement offerings, Regulation D offerings, employee stock benefit plans, as compensation for professional services, or in exchange for providing "seed money" or start-up capital to the company.

104.     Control securities are those held by an affiliate of the issuing company.  An affiliate is a person, such as a director or large shareholder, in a relationship of control with the issuer.  Control means the power to direct the management and policies of the company in question, whether through the ownership of voting securities, by contract, or otherwise.  If you buy securities from a controlling person or "affiliate," you take restricted securities, even if they were not restricted in the affiliate's hands.

105.     In order to sell restricted or control securities  one of the following must be done:

    **a.**     **Holding Period**. Before you may sell any restricted securities in the marketplace, you must hold them for a certain period of time.  If the company that issued the securities is subject to the reporting requirements of the Securities Exchange Act of 1934, then you must hold the securities for at least six months.  If the issuer of the securities is not subject to the reporting requirements, then you must hold the securities for at least one year.  The relevant holding period begins when the securities were bought and fully paid for.  The holding period only applies to restricted securities.  Because securities acquired in the public market are not restricted, there is no holding period for an affiliate who purchases securities of the issuer in the marketplace.  But the resale of an affiliate's shares is subject to the other conditions of the rule.

    Additional securities purchased from the issuer do not affect the holding period of previously purchased securities of the same class.  If you purchased restricted securities from another non-affiliate, you can tack on that non-affiliate's holding period to your holding period.  For gifts made by an affiliate, the holding period begins when the affiliate acquired the securities and not on the date of the gift.  In the case of a stock option, such as one an employee receives, the holding period begins as of the date the option is exercised and not the date it is granted.

      **b.**     **Adequate Current Information**. There must be adequate current information about the issuer of the securities before the sale can be made. This generally means that the issuer has complied with the periodic reporting requirements of the Exchange Act.

      **c.**     **Trading Volume Formula**. If you are an affiliate, the number of equity securities you may sell during any three-month period cannot exceed the greater of 1% of the outstanding shares of the same class being sold, or if the class is listed on a stock exchange or quoted on Nasdaq, the greater of 1% or the average reported weekly trading volume during the four weeks preceding the filing a notice of sale on Form 144. Over-the-counter stocks, including those quoted on the OTC Bulletin Board and the Pink Sheets, can only be sold using the 1% measurement.

      **d.**     **Ordinary Brokerage Transactions**. If you are an affiliate, the sales must be handled in all respects as routine trading transactions, and brokers may not receive more than a normal commission. Neither the seller nor the broker can solicit orders to buy the securities.

      **e.**     **Filing a Notice of Proposed Sale With the SEC**. If you are an affiliate, you must file a notice with the SEC on Form 144 if the sale involves more than 5,000 shares or the aggregate dollar amount is greater than $50,000 in any three-month period. The sale must take place within three months of filing the Form and, if the securities have not been sold, you must file an amended notice.

***SEC Rule 144***. By engaging in wrongful conduct in violation of Rule 144, the Defendants, acting in conspiracy and in concert, acted as underwriters. By promising unrestricted stocks at a discount to affiliates and insiders in exchange for their purchase of restricted stock swapping restricted stocks for unrestricted stocks, defendants were knowingly and intentionally selling unregistered securities in violation of Rule 144 and Section 5. All of the shares sold by Defendants in this manner are to be reclassified as restricted shares rather than free-trading shares.

      106.    Additionally, since all of Defendants' shares came from controllers of Top Gear, Inc., a shell company, and were transferred to affiliates and/or control persons at the new entity,

all of the shares were restricted and each of Defendant's sales of the shares were in violation of Rule 144.

**Count 12 – Violations of 18 U.S.C. §1341, §1343, and §1346 (Mail Fraud & Wire Fraud):**

107.    Defendants acted in conspiracy to obtain money and shares by using false, misleading, and fraudulent communications through the US Postal Service. By knowingly publishing press releases related to the stock in the company while simultaneously concealing the gypsy swaps, insider trading, stock manipulation, and death spiraling, defendants were willfully and intentionally engaged in mail fraud. Defendants also used interstate wire communications to conduct the same illegal and fraudulent activities. Defendants further used the postal service and wire communications to deprive Plaintiff of their intangible right to receive honest financial services in violation of 18 U.S.C. §1346.

108.    There are three (3) elements to mail and wire fraud:

a.      Intent;
b.      A "scheme or artifice to defraud" or the obtaining of property by fraud, and
c.      A mail or wire communication.

109.    The acts of Defendants meet the above 3 elements.  Defendants used the internet and mail system to: a) make false representations to Plaintiff regarding the structure of the acquisition of Top Gear; b) make false representations to Plaintiff and the SEC concerning their ownership and control of the share in Top Gear; c) publish false advertising and marketing materials to artificially inflate the price of LUXR; d) create artificial trades amongst themselves to drive up the market price of LUXR; e) to disguise the restricted nature of their shares; f) to disguise their identities while selling LUXR shares to drive down the price; g) to fail to disclose in their communications that they were affiliated with persons who had been enjoined from

having anything to do with stocks; h) to fail to disclose in their communications that their co-conspirators who had legal findings of moral turpitude would be actively and directly participating in the stock transactions surround LUXR; i) to  fail to disclose the ownership of Jinsun, LLC and Next Media, LLC, to Plaintiff and other shareholders; j) using Jinsun, LLC and Next Media, LLC, to disguise the fact that the internet and mail advertisements for LUXR were being paid for by Defendants; k)failing to disclose to Plaintiff that Defendants had been involved in numerous other pump and dump stock schemes; l) to misrepresent that actual value of LUXR stock to Plaintiff to and other investors; m) and to defraud Plaintiff from their ownership of LUXR by driving down the stock price using internet based trades, while knowing Plaintiff could not sell their shares.

**Count 13 – Violation of 18 U.S.C §1348:**

110.    Defendants knowingly and intentionally engaged in a continual and concerted effort to defraud Plaintiff and other investors in connection with the stock of the company, the merger, and the listing of the stock on the market. The pertinent statute states:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o (d)); or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery, or any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o (d));
>
> shall be fined under this title, or imprisoned not more than 25 years, or both.

18 U.S.C. §1348. Defendants' actions as outlined above are in direct violation of this statute. Further by acting in conspiracy all of the Defendants are equally liable for the violations. 18 U.S.C. §1349.

**Count 14 – Violation of FINRA Conduct Rule 2310:**

111.    The Financial Industry Regulatory Authority ("FINRA")  licenses individuals and admits firms to the industry, writes rules to govern their behavior, examines them for regulatory compliance, and is sanctioned by the U.S. Securities and Exchange Commission (SEC) to discipline registered representatives and member firms that fail to comply with federal securities laws and FINRA's rules and regulations. FINRA Conduct Rule 2310 provides, in relevant part:

> "In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation  is suitable. . . ."

Defendants were aware that they were recommending the purchase of Top Gear shares to Plaintiff to facilitate the defrauding of Plaintiff and other investors. Defendants knowingly and intentionally violated FINRA Conduct Rule 2310. Upon information and belief one or more of the Defendants is a FINRA member.

**Count 15 - Violation of 15 USC 77e & k and §5 of the Securities Act of 1933:**

112.    Defendants knowingly caused false registration statements to be filed and issued securities without properly registering them. The pertinent statute states:

>  (a) **Sale or delivery after sale of unregistered securities**
> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
>
> (1) to make use of any means or instruments of transportation or communication

in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

(b) **Necessity of prospectus meeting requirements of section 77j of this title**
It shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or

(2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

(c) **Necessity of filing registration statement**
It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

 (e) **Security-based swaps**
Notwithstanding the provisions of section 77c or 77d of this title, unless a registration statement meeting the requirements of section 77j (a) of this title is in effect as to a security-based swap, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, offer to buy or purchase or sell a security-based swap to any person who is not an eligible contract participant as defined in section 1a (18) of title 7.

15 USC 77e. Further, civil liability under the statute is as follows:

(a) **Persons possessing cause of action; persons liable**
In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not

misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.
If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person.

15 USC 77k. Such actions violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c). Defendants actively obscured the true ownership of the Top Gear and LUXR shares, and knowingly filed false registrations by failing to disclose the true financial status of LUXR, by failing to disclose their insider trading, and by failing to disclose other information as previously outlined above.

## V.

## DAMAGES AND RELIEF

A.      **Harm to the Plaintiff**

113.    Plaintiff suffered harm in the following ways: (1) the stock Plaintiff Amir obtained and/or bought was devalued by Defendants' unlawful selling, (2) LuxeYard was deprived of finance by reason of Defendants selling their stock to the public, thereby reducing the value of Plaintiff's stock, (3) the value of LuxeYard was devalued by Defendants' frauds on LuxeYard and its shareholders which tainted LuxeYard's reputation, and (4) the Plaintiff is unable to sell his own LUXR stock. Further, Plaintiff Amir has suffered a severe blow to his business and credit reputation and has been unable to obtain additional funding as a result thereof.

B.      **Loss in Value**

114.    The Plaintiff owns 19,316,719 shares of LUXR stock. Whether you take the Defendants' own estimate of the value of this stock, given in their Mailers, or the equivalent values of similar companies, and compare those with the current market price that is low due to Defendants' stock dumping, the Plaintiff has lost millions in value.  It is clear that Defendants' manipulative selling campaign, designed to take advantage of the full ratchet securities, caused a substantial drop in stock price. Looking at the chart, it can be seen that the price dropped from about $1 (perhaps even from $1.5) to its current price of $0.18. Even starting from $1.00, this would give Plaintiff a loss of over $13,900,000 on his current LUXR shares.



115.    Plaintiff has been damaged within the jurisdictional limits of this court. Plaintiff seek recovery of all actual damages; statutory damages; consequential damages,  punitive damages; disgorgement from Defendants of all funds received by or through their fraudulent activity; costs of court and attorney's fees; voidance of all transfers of funds or assets from LUXR by Defendants; restrictions placed on the shares of Defendants, and other relief to which Plaintiff are entitled.   Plaintiff seek that all ill-derived funds and LUXR shares of Defendants be turned over to LuxeYard for the benefit of LuxeYard.

C.    **Punitive Damages:**

116.    Punitive damages are entirely appropriate in this case because (1) the defendants have been engaged in similar schemes with numerous companies and show no sign of stopping their current fraudulent scheme, (2) punitive damages are needed to deter the defendants and others from such conduct, and (3) the Defendants fraudulent scheme is a sophisticated and planned course of action comprising multiple deliberate, willful and knowing violations of the securities laws and other laws, such

as mail fraud and wire fraud, many of which clearly carry criminal penalties for their violation. In fact, the U.S. Securities and exchange Commission makes criminal referrals in such cases using the following standard:

> "In determining whether to make an informal referral to criminal law enforcement authorities, the staff may consider, among other things, the egregiousness of the conduct, whether recidivism is a factor, and whether the involvement of criminal authorities will provide additional meaningful protection to investors."

117.   One example of a recent case similar to the instant case, out of many such examples where defendants engaging in such conduct were prosecuted and jailed for multiple years, is *Securities and Exchange Commission v. Gregg M.S. Berger, et al.*, Case No., 2:11-CV-10403 (RHC-PJK) (E.D. Mich.), announced February 1, 2012, in which (1) the amount stolen involved $33 million in illicit profits from several stock promotions. similar to the instant case, (2) the case also involved the sale of unregistered securities, (3) the case involved dummy accounts to hide control of the float, (4) the case involved the use of fraudulent spam-type promotion, (5) the defendants dominated the public float, (6) there were inadequate disclaimers in the promotion.  In a parallel criminal proceeding, the Department of Justice prosecuted the perpetrators, two of whom were sentenced to over four years in prison.

118.   These criminal prosecutions in cases similar to the instant case and the lengthy jail terms given to those defendants underline the need serious nature of defendants' conduct and the need for punitive damages here. If anything, the

defendants conduct is more harmful than the typical "pump and dump" case because the defendants were not content simply to pump and dump the stock, they then had to drive the stock price down to the lowest possible price. This conduct compounded the damage to investors and the company. The defendants intend to hijack the company and the value created by the Plaintiff using the full ratchet securities they tricked the Plaintiff into issuing. This makes the defendants' scheme a malicious "pump and dump, destroy and hijack" fraud.

119.    Therefore, Plaintiff seek exemplary and punitive damages in addition to their actual and statutory damages.

D.    **Attorney's Fees:**

120.    Plaintiff seek recovery of their attorney's fees pursuant to SEC 10b-5, RICO, Texas Civil Practices and Remedies Code Chapter 32, under the mail and wire fraud statutes, and other any other applicable statute or cause of action alleged in this petition.

## VI.

## APPLICATION FOR TEMPORARY RESTRAINING ORDER

## AND TEMPORARY INJUCTION

121.    Plaintiff incorporate by reference the above paragraphs.  Plaintiff' application for a temporary restraining order is authorized by Federal Rules.  Plaintiff are entitled to the relief demanded and all or part of the relief requires that Defendants be prevented from further devaluing the stock of LUXR in an unlawful dumping of restricted stock.  Additionally, the

public shareholders are also at risk of losing their investment if Defendants are not restrained from further driving down the LUXR stock price.

122.    Plaintiff is entitled to a writ of injunction under the principles of equity and the statutes of this state relating to injunctions, and to prevent the further devaluation of LUXR and Plaintiff' interests therein, and to freeze the unlawful funds obtained by Defendants from unlawfully selling restricted stock as unrestricted.  Defendants appear to be ready to dump their remaining shares on the market.  If Defendants are not enjoined, irreparable injury to Plaintiff, LUXR and to the stock of Plaintiff is threatened, irrespective of any remedy at law.  Further, Defendants operate numerous offshore accounts and entities which they may use to place their ill gotten funds beyond the reach of this court. Last week, Defendants began transferring their shares of LUXR to OBO as outlined above. By placing their shares into OBO's, Defendants have disguised the true ownership of the shares and prepared them for a quick, anonymous sell off. By simultaneously transferring all of their shares into OBO accounts, Defendants have demonstrated that they are working together in a coordinated manner and are attempting to conceal their disposition of the remaining stock. Further, Defendants continue to try and force LuxeYard to agree to death spiral funding to stay afloat. Plaintiff cannot obtain additional funding until Defendants shares are locked up and off of the free trading market.

123.    Plaintiff ask that the Court enjoin and restrain Defendants from:

    a.    transferring, buying, pledging, shorting, or selling directly or indirectly any shares of LUXR stock;

    b.    transferring any shares of LUXR into or out of CEDE accounts; and

    c.    conspiring or colluding with any third party to further devalue the stock of LUXR.

124.    It is probable that Plaintiff will prevail in this suit after a trial on the merits because Defendants have blatantly violated numerous securities laws, both state and federal, as

well as violations of numerous state and federal fraud laws, including mail and wire fraud.

125.    If Plaintiff' application is not granted, Plaintiff and the other 7,000 innocent shareholders of LUXR will suffer irreparable harm as Defendants have already began transferring and hiding their shares of LUXR. Plaintiff will have no adequate remedy at law if Defendants are allowed to dispose of their LUXR shares, further devalue LUXR, or transfer their shares and funds beyond the jurisdiction of this court. Plaintiff are willing to post bond.

126.    Plaintiff ask the court to set this application for temporary injunction for a hearing and, after the hearing, issue a temporary injunction against Defendants preventing Defendants from foreclosing Plaintiff's home.

## VI.

## JURY DEMAND

127.    Plaintiff demand a jury trial and tender the appropriate fee with this filing.

## IX.

## CONDITIONS PRECEDENT

128.    Plaintiff have satisfied all conditions precedent to their claims for relief.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully pray that the Court enter judgment in favor of Plaintiff against Defendants for all actual damages; statutory damages, punitive damages; disgorgement of funds held by Defendants; an accounting of all books and records for the business; costs of court and attorney's fees; avoidance of all transfers of funds or assets from the business by Defendants; and other relief to which Plaintiff are entitled.

Respectfully submitted,

THE SHEENA LAW FIRM

By: /s/ *Danny M. Sheena*

DANNY M. SHEENA, P.E.
State Bar No. 00792830
S.D. Texas Attorney No. 19110
The Binz Law Center
1001 Texas Avenue, Suite 240
Houston, Texas 77002
(713) 224-6508
(713) 225-1560 Facsimile
E-mail: Danny@Sheenalawfirm.com

KEVIN L. COLBER
State Bar No. 4528550
900 Town & Country Lane, Suite 205
Houston, Texas 77024
(713) 465-1630
(713) 465-6491 Facsimile
E-mail: colke1@msn.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of August 2012, a true and correct copy of the foregoing *Plaintiff's First Amended Complaint, Application For Temporary Restraining Order And Temporary Injunction* was sent to the following parties by the following means:

ECF:

David Clouston
SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.C.
900 Jackson Street, Suite 400
Dallas, Texas 75202
(214) 741-3005
(214) 741-3055 Facsimile
E-mail: dclouston@sessions-law.biz
**ATTORNEY FOR DEFENDANTS SCOTT GANN, LAZY BEAR, LLC,
LEE BEAR LLC, SUN BEAR, LLC, & OSO CAPITAL, LLC**

E-Mail:

Sondra Jurica

BREWER & PRITCHARD
Three Riverway, 18th Floor
Houston, Texas 77056
(713) 209-2912
(713) 659-5302 Facsimile
jurica@bplaw.com
**ATTORNEY FOR DEFENDANT KEVAN CASEY**

/s/ *Danny M. Sheena*
Danny M. Sheena

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| (1)  AMIR MIRESKANDARI | § | |
| | § | |
| VS. | § | **C.A. NO. 4:12-CV-02480** |
| | § | **JURY DEMANDED** |
| (1)   KEVAN CASEY, | § | |
| (2)    FAR EAST STRATEGIES, LLC, | § | |
| (3)    JINSUN, LLC, | § | |
| (4)    ACADIA HOLDING CORPORATION, | § | |
| (5)    JONATHAN CAMARILLO TRUST a/k/a | § | |
|          CMK CHARITABLE REMAINDER | § | |
|          UNITRUST, | § | |
| (6)   FREDERICK HUTTNER, | § | |
| (7)    HUTTNER 1999 PARTNERSHIP, LTD, | § | |
| (8)    MESIA HUTTNER HACHADORIAN | § | |
| (9)   JONATHAN FRIEDLANDER, | § | |
| (10)    EQUITY HIGHRISE, INC., | § | |
| (11) MARK TROTTER, | § | |
| (12) SCOTT GANN, | § | |
| (13)  LAZY BEAR, LLC, | § | |
| (14)  LEE BEAR, LLC, | § | |
| (15)   SUN BEAR, LLC, and | § | |
| (16)  OSO CAPITAL, LLC | § | |
| (17) LAWRENCE ISEN a/k/a ISEN FAMILY | § | |
|        TRUST | § | |

## ORDER GRANTING PLAINTIFF' APPLICATION FOR TEMPORARY RESTRATINING ORDER AND SETTING HEARING ON PRELIMINARY INJUNCTION

1.     After considering the application of Plaintiff, Amir Mireskandari, for a temporary restraining order, the pleadings, the affidavits, and arguments of counsel, the Court finds there is evidence that harm is imminent to Amir Mireskandari, and if the Court does not issue the Temporary Restraining Order, Amir Mireskandari will be irreparably injured because Defendants will continue to devalue the LUXR stock by selling their restricted shares and will transfer their remaining stock and gains to third parties beyond the control of this Court.

2.     Therefore, the court temporarily restrains, until the expiration date below, (1)  KEVAN CASEY, (2) FAR EAST STRATEGIES, LLC (3)  JINSUN, LLC, (4) ACADIA LIFE INTERNATIONAL, (5) JONATHAN CAMARILLO TRUST a/k/a CMK CHARITABLE REMAINDER UNITRUST, (6) FREDERICK HUTTNER, (7)

HUTTNER 1999 PARTNERSHIP, LTD., (8) MESIA HUTTNER HACHADORIAN, (9) JONATHAN FRIEDLANDER, (10) EQUITY HIGHRISE, INC., (11)    MARK TROTTER, (12)  SCOTT GANN, (13) LAZY BEAR, LLC, (14)  LEE BEAR, LLC, (15) SUN BEAR, LLC, (16) OSO CAPITAL, LLC,  and (17) LAWRENCE ISEN a/k/a ISEN FAMILY TRUST, from:

    a.      transferring, pledging, shorting, or selling directly or indirectly any shares of LUXR stock;

    b.      transferring any shares of LUXR into or out of CEDE accounts; and

    c.      conspiring or colluding with any third party to further devalue the stock of LUXR.

3.      Bond is set at $_____.

4.      The Court further orders the clerk to issue notice to Defendants informing them that the hearing on Plaintiff' application for Temporary Injunction is set for _____ at _____ am/pm. The purpose of the hearing shall be to determine whether this Temporary Restraining Order should be made a Temporary Injunction pending a full trial on the merits.

This temporary restraining order expires on _____.

SIGNED on the _____ day of August, 2012.

_____
PRESIDING JUDGE